The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons who have any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are much to draw nigh and get their attention. For the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Good morning, Counsel. Mr. Compton, you may be ready. May it please the Court. My name is Nicholas Compton and I represent the appellant in this case, Shaquille Robinson. I would like to reserve seven minutes for rebuttal, which I see that the Clerk has done. Thank you, Your Honor. Your Honor, the facts in this case are not in dispute. On March 24, 2014, the Jefferson County, West Virginia Sheriff's Office received an anonymous tip that an African-American male was in the parking lot of the 7-Eleven in Ransom, West Virginia, loading a firearm, feeling that firearm in his pocket, then entering a bluish-green Toyota Camry driven by a white female and heading out of the 7-Eleven parking lot south on North Mildred Street in Ransom. Upon receiving that tip, Officer Kendall Hudson and Chief Robbie Roberts of the Jefferson County Sheriff's Office left the station and went to track down this bluish-green Toyota Camry. Officer Hudson came upon the Camry on North Mildred Street, stopped the vehicle pretextually for a seatbelt violation. He exited his vehicle, drew his weapon upon exiting the vehicle, and approached the driver's side. When he approached the driver's side, he asked for the driver's license, and he questioned the driver. In your view, over here, in your view, when an officer stops a car with probable cause and the driver of the car has a concealed weapon permit, does that make, does that fact itself make the stop less dangerous or more dangerous? It does not make, I don't believe it makes the stop any more or less dangerous, Your Honor. So it just doesn't matter? Well, I wouldn't say that it doesn't matter. That's not like what you said. Let me say this. I wouldn't say that it doesn't matter. I don't think it makes... No, I mean as far as making it more or less dangerous. I think it's a factor to consider. So what does it do? Make it more dangerous or less dangerous when you consider that factor? I think if you, in this instance, if you factor... I'm just talking about generally. Well, in general, if the defendant is, the person to be searched is complying with the law of the state... We don't know about all that. We just know that person has a concealed weapon permit. Well, I think if he has a concealed weapon permit, and that's what permits him to carry that weapon legally, then I think that that does, that would take away from the factors that the officer has to consider. The officer doesn't know whether or not that individual has a permit. At least the officer on the street is going to stop him. He may not know that he has a permit, and that, in states where you are required to have a permit, the default is not, the default standard is not you are possessing it illegally without a permit. But even if he does, I mean, if the stop is legal, I know you've described it as prefectural, but there's no dispute that the stop is legal. There is not, Your Honor. There is no dispute that it was legal. And permit or not, a gun is, in my mind, no less dangerous in that type of situation. Every firearm obviously comes with, I think, some aspect that it could be used in a manner that could cause harm. But I don't believe that that is just one factor to consider when trying to determine the dangerousness aspect of the armed and dangerous to do the pat-down search. We probably would spend our time better by getting directly to the issue of whether it's harmless or dangerous. You mentioned prefectural. That's not an issue here. That's correct. We don't need to go there to deal with that. This case really comes down to the whole business, good, shit, product, concealed weapon. I don't know what that means, terms concealed weapon, if you can possess a gun lawfully, if it's open and walk out with it, or even if it's concealed, the question is, do you have to show a permit in an instance or is it presumed that you have one? But it really comes down to the question of having a gun. By having a gun, does that mean you're armed and dangerous, at least from my perspective? And I don't know what the implications beyond this case mean for that. I don't believe that having a gun necessarily means anything other than you are armed. I don't believe in and of itself possessing a gun, particularly when you are possessing a gun legally under the laws of the state, either by permit, concealed, or by open carry, or as is now the law in West Virginia, concealed without a permit. I'm just going to ask one question. I know there will be others on it. I understand that position, but why is it safe for these officers, really the paramount concern here? I mean, if he's got a gun, the safety of an officer, we know the statistics in terms of officers being shot, we know the probability of how things can happen. How is it that we can say, if he has a tip, this guy has a gun, he stops him, pretextual or not, why is it at that point that something further, like a frisk, can't happen? We are certainly all concerned with officer safety, but I think the panel... It's not just the safety of the officers, it's the safety of everybody there. That's correct. Safety of the fellow with the gun, too. That is correct, Your Honor. And everybody else, the other person in the car. It's everybody's safety. Yes, sir. That's of concern. What could state law have to do with this? Aren't these, the standards here are fixed by the Supreme Court of the United States. I think state law goes to, Your Honor, the dangerousness aspect of it. Well, the West Virginia legislature can't change the supremacy clause. They can't change the decisions of the Supreme Court. They cannot, Your Honor, but they... Absolutely can. So how could that have anything to do with it? It goes to whether or not the state, which the state legislature can make a determination as to whether or not its citizens are legally allowed to possess a firearm in what circumstances. If they are not, if they possess a firearm openly and are not committing a crime by doing so, then that takes away from the dangerousness aspect. Well, then, Mr. Compton, but aren't you ignoring the facts of this case? You said if they possess a gun openly, this man was concealing a gun, and we have the factual circumstances of the case that provide the additional information that he was loading a firearm in a public place in broad daylight at, what, 2.30 in the afternoon, and he then concealed the weapon on his person. Now, why isn't that indicative of suspicious behavior, irrespective of any laws allowing him to carry a gun? Because none of that is illegal activity in West Virginia, Your Honor. But it doesn't have to be illegal to incite reasonable suspicion. All the police have to do, as I understand the laws of frisking and stopping and frisking, the police, when you're talking about a stop, the police are looking for evidence of illegal activity, and that's one thing, and I think that's what you're pointing to. But when you're talking about whether they have a right to frisk somebody whom they've lawfully stopped, you're not talking about illegal activity. You're talking about factual indicia that someone is armed and dangerous. Isn't that correct under the Supreme Court law, the breakdown of those two concepts? And if so, why isn't this situation indicative that somebody may be dangerous, that this conduct of loading a weapon in a public place in a high-crime area, why isn't that something more than just a citizen arming himself? I think Your Honor has stated it correctly, but I think illegal activity, yes, goes to the first part, can you stop, but it also is a factor to consider. Right, but we don't have to consider the illegal aspect of gun ownership in this case, and whether it's lawful or not, because there was a reason for the stop, and that's conceded in this case, that the stop was valid, correct? Correct, yes, Your Honor. So then we look to the frisk, and in looking at the frisk, we look to whether there is indicia that this person is armed and dangerous. There certainly is that he was armed, and why isn't there suspicion of dangerous activity when you're loading a gun, again, in a public place, in a place where drug activity is apparently frequently conducted? Your Honor, I'm not saying that it is not a factor to consider in the dangerousness aspect. It is a factor to consider. But if the, what... He's saying it's a factor to consider. How do you consider, and this goes back, I think, to Judge Stead's original question, you said in response to his question whether it makes one more or less dangerous that it was a factor to consider. It would be helpful for me to understand, or to have you play out, how you would consider the fact that the person was armed. And who's supposed to be considering this, the officer making the stop, or is this later a judicial determination? I think, Your Honor, the officer has to consider the totality of the circumstances, at the time of the stop. The officer has done a legal stop because of the seatbelt. He has information that this individual is armed. So we have the Terry stop, and we have the armed part of the armed and dangerous. So now he has to consider the factors that could make him dangerous. One of those is this guy has a gun. What is he doing with that gun? Has he pointed it at somebody's head? That's illegal. Did he hold somebody up with it? Did he rob a bank? That's illegal activity. To follow up on Judge Duncan's question, it seems to me what you're saying, all this factor to consider, factor to consider, you're leaving officers completely at sea. And I don't understand when, you know, this is a rapidly evolving situation, and you don't know, you know, when it's going to turn hostile or deadly. And all you're saying is, well, that's a factor to consider and everything. But that's no help in the practical situation on the road. There are factual aspects to this question. The facts which go into whether there's reasonable suspicion for a stop. And then there are the facts which go into the question of whether there's reasonable suspicion to believe someone is armed. But once you have reasonable suspicion to believe those two things, the Supreme Court has said in numerous cases that the frisk can then proceed as a protective measure and something that's designed to lessen the tension of the situation and lessen the prospect or possibility that there's going to be what none of us want, which is a use of lethal force. And instead of this fairly, relatively clear path, you're just throwing up factors to consider. And I can only imagine an officer scratching his head by the side of a road and wondering whether he can take the step of assuring himself that the What are you leaving officers with? How is this going to be taught to them? How is this going to be communicated to them? I think it has to be communicated to them very carefully because I think that they are tasked with making a decision, a very important decision, whether to interfere with the personal liberty of an individual who they wish to stop for whatever reason and then put hands on. I think that's a very important decision. Does the presence of the gun change that calculus? Does the presence of a gun change that calculus on what an officer can and should do? It can. It is a factor to consider in terms of the dangers. Listen, does it alone change it? I don't think alone. No, sir. I do not think having the firearm alone, particularly when you are in a situation, as we have described, where the legislature So your view is that when an officer stops somebody illegally, the officer's approach should be the same to the driver when the driver, when he knows the driver is unarmed and when he knows the driver is armed. In situations, Your Honor, where we are in a I have situations in my question. It should be exactly the same and the officer should just simply ignore the fact that there is a weapon present. If it's in a jurisdiction where the individual is allowed legally to possess a firearm, What he can do, you're saying, is different in West Virginia than it is perhaps in Maryland or Pennsylvania or Virginia. All those are real close by. So he has to know which jurisdiction he's in and know what's up about the state law. So you're saying the West Virginia legislature can change the Supreme Court decisions and the Constitution. What do you do with the Supremacy Clause? You jettison that. No, sir. I think that it, again, is Well, then West Virginia law can't have anything to do with it. Well, but I think it does, sir, in terms of the calculus. Yes, sir, I think that, and I think the panel majority was alluding to this when they said in different times He has to be looking out for the safety of himself and everybody else there in order to carry out his duties. Yes, sir. The Supreme Court has repeatedly said in Terry v. Ohio and Adams v. Williams and Michigan v. Long and case after case after case that, yes, the frisk is, as you said earlier, an indignity. There's no question about that. But it serves in many, many cases to de-escalate the situation and lessen the tension. And that's what you want to do here, is to the degree you can, lessen the tension so that the use of lethal force, which is something no one wants, will prove unnecessary, that an officer will be simply not as uptight and everybody will be not as uptight if they know that there's not a chance of gunfire breaking out. So the Supreme Court cases talk about this in terms of a de-escalation measure and taking some of the tension out of the situation because it's the tension that leads to the worst of all outcomes, which is the use of this lethal force. How can we, come back to Judge King's question, how can we question that sort of rationale that has been given us in case after case after case? We don't have that authority. Your Honor, I understand the court saying that we're trying to de-escalate the situation here. But when an individual is exercising a right that they have given to them by the legislature of the state that they are in, I don't see how infringing upon that right in some way, by patting them down, what happens if they find the gun and they pat them down? They don't just let them keep it, which they're allowed to do, the officer then takes the gun. All because of, for instance, a seat belt violation or a license plate issue. Surely you're not suggesting that the state can grant a right that the Supreme Court can't restrict. No, Your Honor. Your Honor, and I'm not suggesting that West Virginia, again, has the power to overturn a Supreme Court decision. In what I have been suggesting, I hope perhaps... You're saying they can modify it. You're saying they can circumscribe it. And they can. The legislature of West Virginia can't change the law of the land as determined by the Supreme Court? And I don't think that that's what I'm suggesting, sir. You said that's a factor they've got to take into account. Yes, sir, under the armed and dangerous standard. Well, the Supreme Court didn't say anything about taking into account the local ordinance or the local statute when the officer is trying to determine whether to push somebody that he's legitimately stopped by the side of the road, and here that he knows he has a loaded firearm in his belt. Mr. Compton, isn't part of your answer that for 200 years, states have been recognized to create privacy interests, and when a state legislature creates a privacy interest in the possession of personalities, such as a handgun, that personality on the person of a citizen of West Virginia is entitled to exactly the same protection that any other personality on the possession of a citizen of West Virginia, and that, therefore, state law has everything to do with what's protected under the Fourth Amendment? Isn't that right? I think that's right, and clearly the Court has articulated it a lot better than I've been able to for the last several minutes. Let me follow up on that, too, because I think there is another right, and you haven't mentioned the words Second Amendment in this yet, and yet there is a string of cases that has increasingly allowed for citizens to possess guns and to possess them in public places that have been followed up with state laws that have expanded on this right, saying a citizen has this right. So where we come to now is what happens when citizens exercise their right to carry a gun that we call dangerous, but does the dangerous gun make the person dangerous? That's the connection here. It's armed and dangerous. What is it dangerous? The person is armed. Is the person also dangerous? And I'm not so sure, but it seems to me if we go in the direction that we're headed, and it seems like we are, we are saying that individuals with a gun, by definition, are dangerous persons, and that has implications beyond this felon who's carrying a gun. It deals with everybody who exercises a Second Amendment right, and if it doesn't, I'd like to know how we're going to differentiate and carve out an exception just for this instance. Every person that has a gun, a hunter, it doesn't matter if he's got it in his home or wherever, is armed and dangerous if we follow in the direction of this. I agree, Your Honor. I think that's exactly correct. Well, except that, at least in this case, the officer could not simply have walked up to Mr. Robinson because he was carrying a gun, absent other indicia of suspicious activity, and stopped and frisked him for that action alone. The initial stop, which you conceded, is not pretextual. It gives the officer the right to encounter that system, and it seems to me that the compromise here is, sure, the citizens of West Virginia are entitled to exercise their Second Amendment rights, and police officers cannot stop them for simply doing that. But if they do something else that warrants a reasonable suspicion and reasonable cause to stop, then it seems to me that police officers ought to be assured that if they conduct a stop and they find an individual who is armed, that as a result of that, they're entitled to protect themselves and protect others. Why isn't that a reasonable compromise? I want to also add to that factual scenario. This is not just an officer riding down the road to see a seatbelt violation. He's going because he has been told this man has a gun and he put it in him. And while it's pretextual, that's an issue that's not before us, but let's look at the reality of what's happening here. They stopped this guy because of the tip, the so-called tip. Tip of what? There's no tip of anything. They're just because they got some information. And then they track him, and everybody here knows if you want to find a reason to stop a car, you just follow it long enough. It might cross a line. It might go a different place, and you can do it. This is the thinnest of reasons to stop a car for a seatbelt violation because of a tip. But I want you to answer Judge Diaz's question, but we cannot divorce that fact from this case. Well, your Honor's response was, you've conceded that fact's not relevant. You've conceded the legitimacy of the stop, so those facts are not relevant. All we have to decide, all we're here to decide is whether it's legitimate to risk it. Have these legitimately been stopped? Yes, sir. We have conceded that the- Conceded that, so- But I think Judge Wynn is correct in that- Are you withdrawing your concession? Well- What have you conceded? You did not concede that this was not a pretextual-this was a pretextual stop. The officer testified, I stopped the car to investigate the gun tip. That's why I did it. I also had a seatbelt violation. It is a justified pretextual stop under Wren. Correct. Perhaps I misunderstood Judge King, what he was saying to me. It is a pretextual stop because of the- And I'm sorry, I think my time has expired if the court wanted me to- You may proceed with your answer. Thank you, Your Honor. I think Judge Wynn, though, is correct, and that was going to be essentially my answer to you in that, Your Honor, in that it was the-and when the panel majority addressed this, it was the seatbelt, yes, that got him to stop, but the whole reason Officer Hudson and Captain Roberts left the station in the first place was because of the gun. Officer Tharp, who took the call, testified at the hearing that no illegal activity was conveyed to her by this tip. They left because of the gun. They left because of the gun, and the panel majority talks about how you're sort of in this weird sort of Wren-esque situation. Because of loading a gun in broad daylight in a high-crime area, not just the gun. Well, but none of that is illegal activity in West Virginia. Loading the gun- It doesn't have to be illegal activity over here, Mr. Compton. Sorry. If it is objective evidence of suspicious behavior that would indicate a person is dangerous, it doesn't have to be illegal. It can be perfectly legal, but if it can be-and this is what I'm concerned about is that you're trying to deconstruct, and this is what the Supreme Court has told us not to do. Don't just deconstruct every fact in the case and say that fact doesn't matter. It's the totality. It's the facts taken together. And the testimony was this was a high-crime area. Drug activity, not constant, but persistent in the area, and this man was loading a gun and concealing it in a parking lot. Why isn't that objective evidence of suspicious behavior bearing on the issue of dangerousness at the time that he validly stopped the vehicle? When you're considering the totality of the circumstances, Your Honor, I think the officer can consider those factors when determining if this individual is dangerous. I think that- Why isn't that objective evidence that a dangerous activity, loading a gun in the parking lot in the middle of the day, were there drug deals going on? Well, we don't think they were going on at the time, but I'm saying it had a history of drug dealing. Why isn't that something that should activate the officer's concern? It may be something for him to consider, but again, you're correct, Your Honor, there was no drug activity going on at the time. It was daylight, not night. There were two individuals in the car, not four or six or eight. There was a one-to-one ratio between officers and individuals in the vehicle. The loading of the gun and concealing it was not an illegal activity. Yes, they've described it as a high-crime area, and I don't mean to sort of pooh-pooh that, but we hear high-crime area all the time, and in fact, the officers have testified that all of Jefferson County is a high-crime area. Ransom is a particular high-crime area. 7-Eleven and Apple Gardens is a particular particular. I mean, we could get to the point where we are at multiple tiers of high-crime, and the officers just described the entire state of West Virginia as a high-crime area, and that gets to be the point where I don't think that the high-crime area, when they do that, loses the- Loading a gun in a parking lot, you pull in for your big gulp, and there's a guy in the car next to you. Actually, I've been to that 7-Eleven. And somebody's loading his weapon as you go in for your drink. Can you really objectively say that that's not suspicious behavior? I would think it's suspicious. The legislature of West Virginia thinks it's not. No, the state of West Virginia says you can carry a gun on your person. It doesn't talk about what facts are suspicious in their totality. But it sounds like we disagree on that. Yes, ma'am. Well, even so, it seems to me that if we're going to go in that direction, I don't see why we should cabinet with high-crime area. It seems to me someone who goes to a church picnic and pulls out a gun and starts loading it is a pretty dangerous-type looking person to me. So I don't see the reason to cabinet. If we're going to go in that direction, then we ought to just go ahead and call it what it is, not just limit it to what we call high-crime areas, which definitely typically means a particular type of neighborhood. Yes, sir. I agree. All right. Thank you, Mr. Johnson. Thank you. Mr. Booth. You may please record. Under Pennsylvania versus MIMS, the police make a valid traffic stop, and they have reasonable suspicion that the motorist or the passenger is armed. They also have reasonable suspicion that he's dangerous to justify a Terry Frisk. MIMS stated that when the officer noticed a bulge that resembled a weapon in the motorist's coat pocket, he properly concluded, and I quote, MIMS was armed and thus posed a serious and present danger to the safety of the officer. The officer was in an open carry state, but the fact that the officer had noticed a bulge in someone's pocket gave reasonable suspicion to make a stop and then a Frisk. You've asked two distinct questions, which are sort of at the heart of this case, which is what do you... What reasonable suspicion do you need to have to make a stop,  because as I recall, Pennsylvania was not an open carry state at the time that MIMS was decided. Is that right? You are absolutely correct about that. Well, let me then... I'm going to continue the rest of that argument in a minute, but I do want to get to the point that has been raised by some of the judges in this case. No, just ask your question. You're there now. Okay. Well, the question is, what is the impact of a state law that allows for the open carry of a firearm in the context of a Terry Frisk? And my answer is nothing. And the reason is because the Supreme Court has said twice, both in Adams v. Williams and then again in Michigan v. Long, that the validity of a Terry Frisk does not depend on whether or not the state gives the individual who has been stopped a right to carry a firearm. So you're suggesting that in this case, the officers could have simply stopped Mr. Robinson from taking an open carry firearm? No, Judge, he hasn't. And again, that's why I wanted to differentiate between a stop and a Frisk. Because, I mean, in both these cases, Mims and Adams, you weren't dealing with states that had open carry provisions, right? I agree with you, Judge. That changes the calculus. No, it... Well, the reason I believe that it doesn't change the calculus is because, again, the Supreme Court has said twice, Adams v. Williams and Michigan v. Long, that it doesn't make a difference. Now, I agree... That was back... I'm sorry. Where am I? I know. Over here. In Adams' counsel, the question was, given numerous indicia of grave suspicion, it's the middle of the night, the guy is sitting in a car by himself, they have reasonable suspicion to suspect that he's involved in drug offenses, and he has a gun. Under those circumstances, is the possibility that the gun is legally owned sufficient to make all the rest of it evaporate? And the answer is no, and nobody is arguing about that in this case. Everybody agrees on the facts of Adams, there was reasonable suspicion that that gun, that person with the gun, presented a danger to the police. Oh, and he refused to cooperate. He wouldn't talk to the police officer when he was approached. That's just a different question. Here, the question is not to... Does the gun itself, a legally possessed gun, make the owner of the gun a danger to the police if he is not sitting by himself in a car in the middle of the night, is not dealing drugs, and is not refusing to cooperate with the police? It's a different question. Well, Judge Harris, my answer to that is in Adams v. Williams when the Supreme Court said that it didn't matter whether the state allowed it, because in that case, Connecticut did allow it, by the way. Their dissent pointed that out in the case. The Supreme Court said it didn't make a difference. Now, again, so let's assume, okay, they just said it once in Adams v. Williams, but then let's go back now to Michigan v. Long, where they say it for the second time. So my answer is, the Supreme Court having said that twice, it's up to the Supreme Court to decide whether or not, in the wake of Heller, state laws that allow individuals to carry firearms in public, it's up to them to decide whether that makes a difference for purposes of... Mr. Booth, Mr. Booth. Let me ask this. Do you think any of the factors in this case are necessary for your argument other than the belief there's a gun presence? In other words, does your argument rest at all on loading the weapon, high crime area, or any of that? Or is it just the presence of the weapon that authorizes whatever you propose? We've made two arguments in this case. Our first primary argument is that under Pennsylvania v. MIMS, valid traffic stop, reasonable suspicion to believe that you are thus dangerous, no further facts, no further evidence of dangerousness is required. However, if the court... Is the answer to this question yes? No. Judge, that's a very direct question. You said the presence. Is that enough? Oh, yes. I mean, if you are armed, you are thus dangerous. But our second argument is that, assuming that the court does not agree with our submission that MIMS controls this case, then our secondary argument is, if you need proof of case-specific dangerousness factors in this particular case, you have to... But you think under the law. You think under the law you don't need anything other than the presence of the weapon. The presence of the weapon. And the reason why MIMS equated being armed with being dangerous is because it reflects the reality that traffic stops are inherently dangerous. Okay. So a slight variation on Judge Shedd's excellent question. Counterfactually, let's assume they were wearing seatbelts. And contrary to Judge Wins, reasonable hypothetical, they never touched the lines. They never exceeded the speed limit. No traffic offense that even the best officer in the world could pretextually come up with. And it was an honest officer who absolutely testified, I stopped the car because of the anonymous tip that there was an armed individual in the car. Would your argument be exactly the same? Because really that's what Judge Shedd is asking you. Well, again... What else do you need to succeed? To succeed for purposes of a stop or for a frisk. Well, see, that's the point. Right. That's the point. There's no evidence of a reasonable suspicion of a crime until you get to the seatbelt filing. That's correct. So Judge Shedd is asking you, as I amended his question, take the seatbelt violation out of the case. Do you have reasonable suspicion of the commission of an offense? For purposes of a stop, no. No. But if you had... So if he hadn't come up with the seatbelt violation, the mere fact, the government's position here is the mere fact that in a high crime area in the middle of the day, in a 7-Eleven parking lot, a man loaded a weapon, put it in his pocket, and got in a car, that would not constitute reasonable suspicion to affect the stop. Most likely, yes. We've conceded that, yes. But I said there was two distinct... Sir, can I just... Judge Monska, right ahead. So that means that in that situation you would not regard the person as armed and dangerous? No, because the... Exactly the same situation, except there's no pretext for the stop. The armed and dangerous formulation, Judge Monsk, comes up once you have a valid carry stop or a valid right, and you have reasonable suspicion that he's armed. There is, again, as I was trying to explain to Judge Diaz a little bit earlier when he asked me the question about the carry stop, there is a fundamental difference in evaluating the significance of an open carry provision in dealing with whether an individual can be stopped for an offense. Are you saying that it depends... Go ahead, Judge Johnson. Are you saying that it depends on whether or not the facts require an encounter? So, for instance, under Judge Monska's proposed set of facts, you could see a man with a gun in a parking lot get in a car and drive away, but once you had the seatbelt violation in the stop, that brought the two necessarily together and created the danger?  Is that a part of your analysis? Yes, absolutely, Judge. I agree with that. Yes, in other words, what happens any time... I'm not asking you to... I mean, I'm really not asking for agreement. I'm asking for an assessment of whether... But how can that be? Driving away at a lawful speed with your seatbelt on makes you armed and dangerous? No, I didn't say that. No, you're not armed and dangerous when you do that, but if you don't have the seatbelt on and you're just doing it, you are. That can't be your answer. No, Judge Monska... But it is. That's the thing. So, hypothetically, if... Now, remember, Robinson is a passenger, and so if two blocks down the road the car pulls over,  can the police stop him as a pedestrian? No, there wouldn't be an offense if that... So, he's no longer armed and dangerous. Right, again... Or armed, thus, dangerous. He's armed at the reasonable suspicion level, but he's no longer dangerous because he's a pedestrian. But as a passenger in a car stopped for a seatbelt violation, he's armed and thus dangerous under the government system. That's right, and the reason for that is, Judge Davis, as I'm trying to explain, is that the Supreme Court has said that traffic stops are inherently dangerous. As the Supreme Court said in Rodriguez, they're especially fraught with danger. But they also said that you can treat a passenger with the same level of suspicion for the protection of the officer under MIMS. So, in terms of the danger of a traffic stop, it doesn't make any difference whether it's the motorist himself or herself, or a passenger. The court has said you can order a passenger out of a vehicle, just as the officer did here, treating the passenger just as you would treat the motorist when it comes to the dangerous analysis. But your submission is, once he's a pedestrian, unconnected to the vehicle, then he's no longer dangerous. Although the level of belief that he's armed is exactly the same. What if he were a jaywalking pedestrian? What if he stepped off the sidewalk? That violates municipal ordinances in a lot of places. So then he'd become dangerous again. He's wavering in and out of being dangerous. My submission would be that even in the case of a municipal ordinance, if you have a valid stop... It has to not be like a consensual encounter. We're talking, in this case, only with respect to carry stops. So there has to be reasonable suspicion that an individual has committed a crime. Our submission will go even further and say, in that situation even, if reasonable suspicion you've committed a crime, even if it's a municipal ordinance, and you have reasonable suspicion that the suspect is armed, he is dangerous, and you can frisk him at that purpose. That takes away from your traffic stop. That takes away from your rationale. You just said the Supreme Court said a traffic stop is inherently dangerous. Well, the level of dangerousness in traffic stops far exceeds the level of danger. I know, but that would be your justification in your answer. Earlier, I think your position might well be that a valid stop and an encounter or stopping, whatever you want to call it, justified interaction with that person who you have reasonable suspicion to believe is armed might create a dangerous situation that would allow reasonable suspicion, not just of criminal activity, but you're talking about reasonable suspicion of armed and dangerous. Do you think you could make that assessment in a valid stop where if he's just walking down the street, being armed would not be enough to stop him? But you were using the justification a little bit earlier. You kept reading that the traffic stop is inherently dangerous. The traffic stop. But I said earlier, I'm trying to make a point. Maybe I'm not succeeding as well as I would like to be. There is a difference in the reasonable suspicion calculus in deciding whether a stop is lawful. I've got that already. But I'm talking about when you were saying that the calculus on reasonable suspicion for armed and dangerous is in large measure you get the benefit because the Supreme Court has said a traffic stop is inherently dangerous. That's what you kept saying. But these scenarios, we could come up with others when it has nothing to do with a traffic stop. That is correct. But your answer is the same. And my answer also applies, for example, in Terry v. Ohio, which did not involve a traffic stop. It involved a burglary robbery. And in that particular case, the Supreme Court basically said the same thing, that you were armed. So you don't think it required a traffic stop. You just think those are the facts of this case. Well, a traffic stop. This is a traffic stop judgment. I know that. And under MIMS, the danger inherent in a traffic stop is exceedingly high. So that's what my question is. So you think in this case we have the law on a traffic stop, which justifies the pat-down in these facts. Yes. But you don't think you need this scenario with the exceedingly dangerous situation of a traffic stop. You think, I think you were saying this, that just a lawful encounter that includes reasonable suspicion of a weapon would be enough for a pat-down. Yes. No, that's not what you said. That's not what you said. If the driver of the vehicle was the one that had the seat belt violation and not the defendant, your answer is the same, but you're saying. I'm sorry, if you could repeat that. In other words, here the defendant had the seat belt violation. So they stopped the car because of that. But if the driver of the car had the seat belt violation, not the defendant, your answer is the same. He's armed and dangerous because the car has been stopped. Any time you have a traffic stop. Did you understand my question? That's either yes or no. What if the defendant didn't do anything wrong? He's wearing his seat belt. If he's wearing his, the driver does not. The car is stopped by the officer. Same scenario? Same answer? Well, in the event that you have one person does not have the seat belt, and if it's a violation of West Virginia law, the officer can stop the car if the passenger doesn't have the seat belt. But the answer is either yes or no. I mean, I understand the explanation. The answer is either yes or no. Well, the answer is if anybody in the car is reasonably suspected of being armed, then you can frisk him under carry, yes. Okay, so what about the case where he got out of the car? All of the same facts. The tip, the driver's driving along, you see the seat belt violation, but there's a couple blocks ahead of him. Our defendant here gets out of the car and starts walking down the street. Well, if the officer is making a traffic stop in that situation, even though the passenger has – A couple blocks later, he stopped the car, where their defendant is no longer in the car. Well, if he's just gotten out – that's a tougher question if he's just gotten out of the car. I mean, what happens is – Do you see the problem there? I mean, if you're having a problem with it, it suggests that if there's nothing about him concealing the weapon, that makes it armed and dangerous. Anytime you have a traffic – anybody in the car who – well, if you have an individual in the car who is suspected of being armed and he's in a car and there is a legitimate stop – Your point is the passenger can shoot an officer as well as a driver. Of course. So in this particular case, the evidence in this case was it was the male that had the firearm. It wasn't that the female. So the government – we would not agree that the female, the driver, could have been frisked under Terry because there was nothing to believe that she was armed. I understand, but you – do you understand my hypothetical? I'm multi-laboring. They stop at a traffic light. The cop is a couple cars behind him, so he doesn't stop in there. The guy gets out of the car and starts walking. He's going to go get a soda. And the driver drives along. Oh, the driver, and so he's gotten out of the car. There's no ceasefire. Out of the car. No, then in that case, there's no reasonable suspicion to stop. So he is no longer armed and dangerous. Right, there's no reasonable suspicion. Remember, Judge Motz, the armed and dangerous formulation only comes up once you have had a legitimate stop of that individual and reasonable suspicion to believe that he is armed. When we do all these hypotheticals here and there, there's a danger, I think, of moving away from the basic thrust of the Supreme Court decisions in case after case after case, and that is when you get in a situation where a gun is present and where you have a stop, which is a traffic stop particularly, but other stops, they have a certain level of tension. But the Supreme Court says when you get in these confrontational situations or tense situations, a policeman is justified in taking a small protective step that may save a life, whether it's his or someone else's or the suspect's. It says these are situations that are inherently tense. They inherently have a certain degree of confrontation. There's apprehension about what the police may find. There's anger at being stopped, and so the situation can turn on you. And given the dynamics of these situations as a general rule, it makes sense to just allow a small protective step that may very well be life-saving. Well, I agree with Judge Booth. It was some time ago, but I really respectfully must challenge your last statement. You said, and your whole argument turns on this notion that it is the stop, the legality of the stop, that informs the armed and dangerous analysis. But in fact, as I'm sure you'll recall, the famous Officer McFadden in the Terry case didn't affect the stop at all, right? Remember, the defendants, Mr. Katz in particular, was walking back and forth in front of that business, and McFadden walked up to him. He was a pedestrian. And McFadden had reasonable suspicion that they were casing the joint for a robbery, as someone earlier suggested. And McFadden said a few words, Katz mumbled something in response, and McFadden immediately laid on hands and produced the handgun from inside the overcoat pocket when he patted him down. So one of the ironies of Terry and the so-called stop and frisk is that in Terry, there was no stop. It was an encounter between pedestrians in downtown Cleveland. So the Supreme Court, is that all coming back to you now? So that the whole armed and dangerous, the ideology, the origin, the genesis of the notion that a police officer can frisk an individual with whom the officer is entitled to have an encounter, that whole doctrinal background arises out of a case that didn't involve a stop, that involved only a frisk. And Chief Justice Warren was very clear that this was supposed to be a limited intrusion on less than probable cause because we want police officers, one, to prevent crime, not just solve crime, and two, protect themselves. So honestly, it's not true that every stop is okay to give rise to a frisk. Those are two separate analyses just as armed and dangerous are separate analyses. You're arguing that it's armed or dangerous that gives rise to the frisk, and that's not what the Supreme Court has ever said. Judge Davis, in describing Terry, you said that the officer, McFadden, laid his hands on the suspect. Yes, he patted him down, felt the bulge, reached into the pocket, pulled out the handgun. I think they stopped him at that point. No, they were standing on the street. Terry has always been viewed as a Terry stop and a Terry frisk case. Absolutely incorrect. Look it up. There was no stop in Terry. It was a consensual encounter between McFadden and Katz outside the business. There was not a stop. Again, one of the ironies of Terry, we call it stop and frisk, but it was really only about the frisk. Remember Justice Harlan's concurrence goes into the discussion about, well, first we have to talk about whether it's okay for a police officer to even be in the presence of an individual. And he elaborates the notion that, yes, it's okay for a police officer to be in the presence of an individual, provided there's a sufficient evidentiary basis, i.e., reasonable suspicion.  Because they were standing there on the street. McFadden had been peeping around the telephone pole watching them as they cased the joint. Justice, I'm sorry. I must disagree with you. I have always understood Terry to be a case involving a stop. You're not alone. Mr. Booth, though, over here. You were relying also on Pennsylvania v. MIMS, right? Yes, that's right. Your chapter, Terry? Yes. So is it your point then, sir, that the Supreme Court took Terry and then applied it to different situations? I don't know. I'm not clear from what you're saying. No, you're absolutely correct. Because you haven't really talked about the progression of the law over time here and what the Supreme Court did in Adams v. Williams, what it did in Pennsylvania v. MIMS, and the evolution of this concept through, I guess, maybe Arizona v. Gantt. I'm not sure. But the different cases and how the Supreme Court has talked about it, isn't that something we have to consider how the law has evolved and not consider it just as a frozen concept? And it seems to me that maybe you're leaving that out of your analysis. Well, in particular, are you talking about the legitimacy of the armed and dangerous formulation outside of traffic stops? Well, this is a traffic stop. Exactly. This is why I'm relying centrally on MIMS. Well, if it was limited in some way in Terry, the Court has expanded it as time has gone along, as it's faced new factual situations. And then they extended it even further in Michigan v. Long when the Court held that what you could do is actually, if you have a Terry stop of a car, you could go into the passenger compartment to go ahead and get the deal. One thing I'd like to, since you brought up Michigan v. Long, is that the Supreme Court repeatedly uses the term potentially dangerous in that context to refer to somebody who is armed. Mr. Booth, Mr. Booth, do you agree that the same-tip driver is the defendant or the person stopped? He's alone. Seat belt on. There would be no reason to stop the car. Correct? Same-tip person driving is the defendant or the person stopped. He's here. He's driving. He has his seat belt on. No other traffic violations. There's no other traffic violations, and all you had was a tip and no traffic violations? That's what I said. Same-tip. He's driving. Lawfully. No reason to stop. Right? We don't believe under the facts of this case that that would amount to reasonable suspicion to stop the car. All right. So, dangerousness, armed is already there because there's reasonable suspicion that he's armed. The conjunctive of dangerousness, the police officer creates that by his presence or her presence. That dangerousness is solely based on the presence of the police officer, not anything he was doing. But Lee Gallagher, right? It's the presence of the officer that creates dangerousness. Gregory, what happens when you have, yes, a forcible encounter between a police officer? It doesn't matter whether it's forcible or not. It goes back to, for example, you talk to someone on the street. Jess Davis was talking about in a sense, and you believe that someone told you they're armed. In that circumstance, wouldn't every instance be dangerousness is created by the police officer encountering them? And when you're having a police encounter alone, that is to say not a Terry stop, the fact that an individual is armed doesn't give rise to the armed and dangerous formulation. It doesn't. It would make them dangerous. You've got a gun, a person, and a police officer. That triangulates with the dangerousness, doesn't it? Right. Doesn't it? Just having a firearm in and of itself doesn't make you dangerous. My purpose for purposes of this case. I know it's even out there on the front. A police officer makes you dangerous. Presence. Right? A police officer doesn't. I'm trying to understand. If the police officer is encountering you, wouldn't the police officer have the same interest in being safe? Because he knows you have a gun based on his tip or whatever. What difference does it make? You're there. You have the gun. Doesn't that make it dangerous in every instance? But you have to have a justification for doing the first. Had the Supreme Court said that police officers can encounter people without walking down the street, police officer, hey, sir, ma'am, can I speak to you for a second? Are you telling me that a police officer can't do that? Of course. Well, then, if he or she is present and you have a gun, doesn't it make you dangerous? I think you're using the word dangerous in a colloquial sense. Might be killed. Is that colloquial? Well, I'm trying to think. What do you call dangerous? Mr. Booth, it sounds to me like you're backing yourself off your original position that you're now really saying there have to be plus factors. The fact that your arm doesn't make you dangerous in a traffic stop. No, I didn't say that. Well, it sounds like that's where you're going. No, let me go back. Judge Gregory's question was a consensual encounter. No, I've said from the very beginning. What does that have to do with dangerousness? A consensual encounter. As Judge Wilkins said, you could be shot consensual as one that you entered there. What difference does that make? That's really what the case is about. You're creating dangerousness by the police presence. So that doesn't make any difference whether it's consensual or not. Go ahead. It makes a difference in order for the police to frisk and that they forcibly take a gun away from it. That's what they did here. Of course, because as I'm trying to explain to Judge Keenan, under MIMS if there is a valid traffic stop. I think this is consistent with what everyone else is asking you. So you are conceding, right, that if it's a consensual encounter. We have held in black that just because you are carrying a gun, you can't be stopped. And you agree with that, right? A consensual encounter, absolutely. A consensual encounter and you can't be stopped because you're carrying a gun in a public jurisdiction. That is what happened here. The officer testified, I stopped this car because of a tip that the guy was carrying a gun. That is why I stopped the car. Understood it was justified under N because also there was a seatbelt violation. But my question for you, and this goes back to what Judge Wynn asked, given how easy it is, just as a practical matter, for the police to pull over a car because there is probable cause of a traffic violation or something that the police officer mistakenly but reasonably believed was a traffic violation, how much is left of the rule that you can't stop a person for carrying a gun? If all you have to do is wait for them to waver over the middle line or step off a curb right before the light turns, and then you can stop the person and then you can frisk them, just as a practical matter, what is left of our rule in black that you can't be stopped because you are carrying a gun? Well, because what is left is that, again, there has to be a violation that allows you to do this. As a practical matter, how hard will it be for the police to find it? It may be a practical matter in terms of how hard in an individual case it can be, but I have a feeling that your question to me is more directed to the merits of REN. And as long as REN remains in the book, as long as we have a legitimate traffic stop, even though the officer may have an ulterior or a, quote, pretextual motive, but one of the judges said here earlier, this is a valid pretext, the police officers can do that because that was MIMS. All you had in MIMS was an expired license plate, and yet the stop was justified? Can I just say, MIMS is a little bit different. There's something unusual about this case for REN purposes, right? Usually when police conduct, REN is the law, when the police conduct a REN stop, they are limited in what they can do by the justification for the stop. They may have a hunch you're dealing drugs, they pull you over for running a traffic signal, they can write you a ticket, they can't search you for drugs. This is a unique case because in this case, under your position, they pull you over because they have a hunch that the gun you possess might be possessed illegally, and they can now investigate the underlying hunch in the course of the pretextual stop. So this is just an unusual application of REN. Do you see what I'm saying? Well, I understand it's an unusual application, but in our view, this case is virtually on all fours with MIMS. And as far as the legitimacy of the tip, I know that hasn't been raised yet, but I would, to the court, mention the First Circuit's decision in Avila-Vega, which is... I don't think anybody argued about the legitimacy of the tip. If I could just ask you one question. Sure. We've been an active group this morning, not unusually. You know, you rely on Adams, MIMS, Michigan v. Long. All those cases were decided before the Supreme Court's rediscovery of the Second Amendment, right? Do we have anything from the Supreme Court that's telling us how we are to balance Fourth Amendment rights versus Second Amendment rights? Well, that's why I say, Judge Motz, in light of the Supreme Court's decisions in Adams and in Michigan v. Long, that state law doesn't matter, we think it's up to the Supreme Court to decide whether or not Heller makes a difference for purposes... But what about Heller, too? It's not just Adams and MIMS and Michigan v. Long. We also have Heller and its progeny the Supreme Court has decided. But Heller... We're having to deal with all those cases. Well, one thing I would like to say, because I may not have much time left here. We don't have any time left. Okay, just one sentence, and then I'm going to sit down with respect to this. There's no Second Amendment claim raised in this case. For purposes of Second Amendment, when an officer takes the gun away during a stop, he gives it back to him afterwards, so that the deprivation is extremely limited. The stops usually take only about 30 minutes or so. And so any deprivation under the Second Amendment, we would say is really not a violation at all to simply take the gun for the brief period of time that the officer does a stop to protect himself. The whole situation comes up because of the resurgence of the Second Amendment. I mean, that's why West Virginia... You always talk about we don't... Earlier you said we don't pay any attention to West Virginia law. But West Virginia law has evolved because of the evolution of the Second Amendment jurisprudence. Wouldn't you agree? Judge Motz, I'm out of time. I could sit up. Would you like me to... No, you can just say whether you agree or not. No, for purposes of Terry Frisk law, where the Supreme Court says state law doesn't count, we say it's up to the Supreme Court to change the law. Let me ask you, why do we need to limit it if we follow your analysis? We talked about how long you say is deprivation for a short period of time, but it's an individual's right to have a gun under the Second Amendment. Why limit it just to this under your analysis to a cop? That officer is no less endangering when he encounters an individual in any situation that he has a tip, he has a gun, whether a high crime or a church picnic I spoke about. So in your analysis, why don't you just advocate that we just say everybody who possesses a gun, whether lawfully, unlawfully, or whatever, if you have that gun and police have a tip to it, then there's that reasonable suspicion they could be free. Only if there's a valid stop in advance. But I understand that, but why? What's the big deal about a valid stop? He's still dangerous. If that officer encounters him with an invalid stop or with any other situation, the same factors that Judge Wilkerson alluded to about being dangerous and protecting the citizens and everybody else exist. Why don't we just broadly say anybody that exercises a Second Amendment right, they do so with the knowledge that there's a Fourth Amendment and therefore you are going to be subject to being searched and whatever else is necessary for the safety of citizens, officers, and yourself. Is that okay? I would like again to say that it would be up to the Supreme Court. Is that okay? Is that a good analysis? As of right now, the officers can thrust the individual if they have reasonable suspicion to believe that he's armed, even if the individual's state allows him to carry a firearm. And you're just talking about the latitude that you're going as far as the latitude the Supreme Court has given you. I wouldn't go any further. Thank you very much. Counsel, you have some time reserved. No problem. Thank you, Your Honor. The government in their petition for rehearing argued that the standards should be armed and if you're armed then you're automatically dangerous. I think my understanding of the government's presentation just now, and perhaps this was Judge Keenan's inquiry to the government, was that the government is now saying that just having a firearm doesn't make you dangerous. And that has been our position, that the standards should be armed and dangerous, and that those are separate analyses. Is armed and dangerous a unitarian concept? I don't believe so, sir. No. I think that's really a key point here. It seems to be indicated it's not on one side and you say it's not on the other side. I don't believe it's a unitary concept, Your Honor. I believe that there's analysis for armed and then there's analysis for dangerousness that's present. And I think that some of the hypotheticals that the court pointed out during the government's presentation, I think, go to that. If the defendant is, as Judge Motz was saying, sitting in the car, all of a sudden he's armed, and according to the government, would thus be dangerous. But as soon as he steps out of the car or if he jaywalks or if he's at the church picnic, then all of a sudden he's not dangerous anymore even though he still remains armed. And I don't... Am I not correct in it, which is entirely possible, let me tell you, that at least for purposes of Terry Frist's analysis, that the Supreme Court has linked the two and said under the circumstances presented by the forcible encounter, a person who is armed is thus dangerous? So there is some... Am I not correct that the Supreme Court has created some linkage between those two? I don't think that they have created a direct link, as Your Honor suggests. I don't think there's some linkage, too. No? There's no thus in any of these Supreme Court cases? The mem I court said, quote, the bulge in the jacket permitted the officer to conclude that Mims was armed and thus posed a serious and present danger to the safety of the officer. And in those circumstances, any man of reasonable caution would likely have conducted the pat-down and thus posed a serious and present danger to safety. That's what... That's the Supreme Court. We can't change that. I agree. And they don't report to ever try to change it. That's consistent with what Terry said. And to follow up on that, what the Supreme Court has done is it seems to me to strike a very careful balance. And what they said is you have to... The police are not free to run wild. They have to have, number one, reasonable suspicion for a stop, and they have to have, number two, reasonable suspicion that someone's armed. And those two things protect the rights of the citizen, the motorist. And then there's a third prong which protects and balances by protecting the safety of the officer. You protect the rights of the citizen through the first two prongs in terms of the reasonable suspicion for the stop and reasonable suspicion that they're armed. But then if those two criteria and conditions are met, you have to balance the situation by protecting... by according some protection to the safety and the life of an individual officer. And what the Supreme Court, it seems to me, didn't want to happen is what I worry will happen with your argument because you've all...you've given... I don't know how something like this would ever be taught at the police academy because we want them to obey our decisions and, in turn, we've got to give them something that can actually be communicated to them. What you've given is just throw the balls up in the air. And that seems to me to require an officer whose life could be on the line to make a very fine-shaven totality of the circumstances, this, that, this, before he can even take a step that may very well save a life and an innocent life at that. And it seems to me we... there's a danger of just knocking the Supreme Court decisions and what they've tried to accomplish and what they've tried to balance just knocking it completely off the tracks with your views. I think Your Honor has described it as three prongs, the prong to stop, the prong of disarm, and then the prong of the dangerousness. That's not what the government is suggesting. The government is suggesting that we have the first prong and the second prong and we can just stop. Let me say this. Back to the question that Judge Duncan asked you, followed up by Judge King, armed, thus dangerous. Answer that question. You said you didn't think the Supreme Court had said that. Well, he read it to you. Why does that not make it the second prong that does that? I think the... and it may be the sentence or two prior to that, but they also used the phrase armed and presently dangerous. They used the conjunctive there. I don't think that because they used the term thus in that... Over here, can I ask a question? You are conceding, aren't you, that in a non-open carry jurisdiction where it is illegal to possess a gun in public, if the police see someone with a gun, there is now reasonable suspicion that that person is armed and dangerous because they are illegally carrying a gun. People who illegally carry guns do so for nefarious purposes. It's sort of the topology. I think that's correct, Your Honor. And it was certainly correct above the Mason-Dixon line. Right. At the time, MIMS was decided per curiam without argument in 1977, wasn't it? Yes, Your Honor, it was. And I think that that was sort of the point that I was not articulately making originally was that what Judge Harris, you've described, would be these illegal activities that were taking place with the gun, and it could be the illegal activity could just be the illegal possession of the gun. But that's not what we have here under the facts and circumstances of this case, and it's not what we have in West Virginia in 2016 or 2014 when MIMS... The oldest line in the book, when guns are illegal, only criminals will have guns. That's why MIMS is a different case. Yes, Your Honor. I agree. I have five seconds left. Are you glad? Are you complaining? No. Roger. Thank you. Mr. Chief? No, I don't have a question for him. Let me say it. I just want to say this. I thought the discussion this morning has been a good discussion. I thought the court has been on good behavior. I think in large measure meeting the standard of our former chief judge, but also out of respect for our new chief judge, which we all acknowledge today. Thank you, Judge Harris. All right. With that, we'll ask the clerk and court to, I guess, adjourn us for this special session in bank, and then we'll come down and recount. Mr. Honor, the court will take a brief recess. Thank you.
judges: Gregory, Wilkinson, Niemeyer, Motz, Traxler, King, Shedd, Duncan, Agee, Keenan, Wynn, Diaz, Floyd, Thacker, Harris, Davis